## COMMISSIONER OF REVENUE *vs.* BAYBANK MIDDLESEX & others.[1]

Suffolk. October 4, 1995. - January 24, 1996.

Present: LIACOS, C.J., LYNCH, GREANEY, & FRIED, JJ.

*Taxation*, Bank excise tax, Commissioner of Revenue, Bonds. *Bonds*, Tax-exempt. *Commissioner of Revenue. Bank. Administrative Law*, Agency.

The Commissioner of Revenue could not, in 1987, without notice, change the policy of the Department of Revenue with respect to the deductibility of tax-exempt bond premiums and could not thereupon retroactively assess back taxes and interest, where the department had, in 1945, issued a valid "Instruction Sheet" stating clear policy on the issue that had remained unchanged and upon which taxpayers had relied until 1987. [739-743]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert J. Munnelly, Jr.*, Assistant Attorney General, for Commissioner of Revenue.

*Robert M. Buchanan, Jr.*, for BayBank Middlesex & others.

*Louis J. Marett*, for the Federal Deposit Insurance Corporation, was present but did not argue.

LIACOS, C.J. In this case, the Appellate Tax Board (board) consolidated 102 appeals and granted to a number of Massachusetts and national banks (banks) abatements totalling $2,688,188.66 from assessments of the bank excise tax, G. L. c. 63, §§ 1 et seq. (1994 ed.), for tax years 1984 through

---

[1]Seventeen other banks and the Federal Deposit Insurance Corporation as receiver for twelve banks.

1990. The Commissioner of Revenue (commissioner) appealed. We granted the banks' application for direct appellate review. We affirm the decision of the board.

The material facts are not in dispute and are these. The General Court's definition of "net income" in the bank excise tax reads in relevant part:

> " 'Net income', the gross income from all sources, without exclusion, for the taxable year, less the deductions, but not credits, allowable under the provisions of the Federal Internal Revenue Code, as amended and in effect for the taxable year."

Compare St. 1933, c. 327, § 1. The excise tax was levied at 12.54% based on such net income. G. L. c. 63, § 2 (1994 ed.). That definition remained for these purposes unchanged until the excise tax on financial institutions was subsumed into a new corporate taxation scheme in 1995. St. 1995, c. 81 (codified at G. L. c. 63, §§ 1 et seq. [Supp. Nov. 1995]).

The current dispute involves the bank excise tax treatment of premiums paid for bonds that are exempt from Federal income tax.[2] To paraphrase the issue, as stated by the board, the question is: Under State tax laws, does the basis of tax-exempt bonds include such premiums as may have been paid to purchase those bonds or does the Federal law excluding premiums paid for tax-exempt bonds from the calculation of basis control? See G. L. c. 63, § 1; Internal Revenue Code, 26 U.S.C. §§ 171, 1016 (1994). In short, this case involves the proper choice of a basis for tax-exempt bonds bought at a premium.

---

[2]The problem is best demonstrated by example. In times of falling interest rates, an investor will be willing to pay a premium over the face value of a bond for a bond issued paying higher rates. Assume a bond with a $1,000 face value, issued sometime previously but payable in five years, that pays ten per cent interest a year. If market interest rates fall to five per cent, then an investor will be willing to pay an amount up to the discounted present value that the ten per cent bond offers over currently issued five per cent bonds.

The Internal Revenue Code (code) makes the "loss" of such premium nondeductible at the time of redemption, in order to avoid a double tax benefit to an investor who has already received tax-exempt interest. Otherwise the investor could, having already received all of the interest tax free, claim a deduction for the capital loss when the bond is redeemed at face value.[3]

This nondeductibility (and accompanying adjustment to basis) for tax-exempt bond premiums became Federal law in 1942. The banks, however, continued to compute their net income for purposes of the Massachusetts bank excise tax without this adjustment, using original cost basis to yield a loss on redemption. The current dispute came about in 1987 when the commissioner sent to the banks notices of assessment, G. L. c. 62C, § 31 (1994 ed.), for tax deficiencies and interest on unpaid amounts. The commissioner asserted that the tax-exempt bond premiums could not be subtracted in the net income calculation because such losses were not deductible under the code.

---

[3]Again, our example, see note 2, *supra*, will help explain the Federal tax treatment. Assume that the investor purchases the ten per cent bond for $1,100. Each of the remaining five years until maturity the investor receives $100 in interest that is exempt from Federal income tax. At maturity the bond issuer redeems the instrument for face value of $1,000. The investor, having paid $1,100 for the bond, has "lost" $100. With respect to a taxable bond, the code allows the investor to amortize the premium amount over the remaining time until maturity of the bond. I.R.C. § 171 (a), (b). There is a corresponding adjustment to basis so that at redemption the face value and basis are identical. I.R.C. § 1016 (a) (5). The investor in taxable bonds recoups the premium once.

If applied to a tax-exempt bond, these provisions would yield a tax windfall. The investor pays no tax on the income stream from such bonds, but would also be allowed to deduct the premium, offsetting other taxable income. Two provisions of the code eliminate this windfall. First, the code declares that the amortizable bond premium deduction cannot be taken for tax-exempt bonds. I.R.C. § 171 (a) (2). Second, the basis adjustment is still made. Without adjusting the basis of the bond, the investor would be able to deduct the capital loss that occurs at redemption — the difference between the premium price and the face value. I.R.C. § 165 (a), (f) (1994) (deductibility of losses, including capital losses). By reducing the basis of tax-exempt bonds each year, at maturity the investor takes no loss, and cannot deduct the costs of producing a tax-exempt income stream.

At the hearing before the board, the banks offered and the board admitted, over objection, an "Instruction Sheet" for bank excise tax returns, issued in 1945.[4] That document states: "In determining the gain or loss on sale or maturity of [tax-exempt] bonds, the basis for determining such gain or loss will be without deduction for amortizable [bond] premium." The Instruction Sheet accords with the banks' method of filing returns. Other evidence of record supports the board's finding that the commissioner and all other interested parties followed the 1945 Instruction Sheet from 1945 until the issuance of the notices of assessment in 1987. There is nothing in the record to indicate that the commissioner issued any additional instructions with respect to bank excise tax returns after 1945. Nor does it appear that this ruling is inconsistent with G. L. c. 63, § 1.

The board granted abatements to the banks, justifying its decision on two grounds. First, it offered a number of alternative reasons why it believed that the banks should be allowed to include the bond premium within the net income calculation, either in the figuring of gross income or as a deduction. Second, the board stated that the commissioner had to abide by his own internal procedures, including instructions for tax forms.

We believe that the second ground for the board's decision is enough to dispose of this case. Although courts give the force of law only to formal agency regulations, administrative agencies must abide by their own internally promulgated policies. See *Broadway Nat'l Bank* v. *Commissioner of Corps. & Taxation*, 321 Mass. 25, 30 (1947) (interpreting bank excise tax provision in light of commissioner's prior position, not a recently adopted contrary one). This is true regardless whether the policy exists pursuant to a formal rule, *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 427

---

[4]The commissioner contended before the board that the Instruction Sheet was not relevant. We give deference to the board's determination of such an evidentiary matter. In any event the commissioner chose not to brief the issue to us, and, hence, we accept the board's evidentiary ruling as being within its discretion. See G. L. c. 58A, § 13 (1994 ed.).

(1983), or an informal guideline, *Macioci* v. *Commissioner of Revenue*, 386 Mass. 752, 763 (1982) (guidelines to local assessors for developing new real property classification schemes). See *Assessors of Holyoke* v. *State Tax Comm'n*, 355 Mass. 223, 243-244 (1969) (ruling with respect to proper tax classification of a particular business entity).

With respect to taxation, the commissioner to one extent or another is bound by a variety of informal policymaking devices: technical information releases, 830 Code Mass. Regs. § 62C.3.1 (7) (f) (1993), directives, 830 Code Mass. Regs. § 62C.3.1 (6) (f) (1993), and letter rulings, 830 Code Mass. Regs. § 62C.3.1 (8) (1993), among others. Instructions that explain and guide the taxpaying public through the revenue laws are no different. 830 Code Mass. Regs. § 62C.3.1 (9) (1993). Cf. *First Fed. Sav. & Loan Ass'n* v. *State Tax Comm'n*, 372 Mass. 478, 485 (1977) (tax return instructions express commissioner's view), aff'd, 437 U.S. 255 (1978). But see *Commissioner of Revenue* v. *Marr Scaffolding Co.*, 414 Mass. 489, 493 (1993) (mere letter, not rising to level of letter ruling, not binding).

A valid instruction sheet existed in this case. The banks followed those directions for over forty years, and no significant change to the bank excise tax statute or tax form occurred in that time. The commissioner should be required to abide by those instructions.

The commissioner refers us to our cases holding that taxpayers have no right to claim an estoppel and allowing the commissioner to correct "mistakes of law" and assesses taxes based on a new interpretation of the revenue statutes and regulations. *Marr Scaffolding Co.*, *supra. John S. Lane & Son* v. *Commissioner of Revenue*, 396 Mass. 137 (1985). Those cases are readily distinguishable from the situation here. In *John S. Lane & Son* v. *Commissioner of Revenue*, *supra*, the taxpayer had at one time been classified as a manufacturing corporation, subject to one particular tax regime. *Id.* at 137-138. The commissioner later discovered that the taxpayer had ceased being a manufacturing corporation, and should instead be subject to the tax regime for business cor-

porations. *Id.* at 138. We upheld the commissioner's change
of legal position with respect to that one taxpayer. *Id.* at 140.
*Commissioner of Revenue* v. *Marr Scaffolding Co., supra,*
did not involve any sort of broad policy statement. In that
case, the taxpayer received a copy of a letter — not a ruling
— from the Department of Revenue (department). *Id.* at
491. The letter allegedly binding the agency simply did not
state policy in any official way. To say that a taxpayer may
not invoke "estoppel" against the commissioner is not the
same as holding the commissioner to official statements
whose promulgation is authorized by specific statutes and
regulations. *Id.* at 492 (had letter in fact been a letter ruling,
"estoppel" would not be needed; agency would be bound be-
cause regulations do not allow retroactive revocation).

Here, the commissioner promulgated a policy statement
via the 1945 Instruction Sheet. It was far more than a mere
letter on agency stationery; forms are specifically authorized
by the General Laws, G. L. c. 62C, §§ 3, 5, 12 (1994 ed.),
and regulations provide for instructions, 830 Code Mass.
Regs. § 62C.3.1 (9). The attempt to change policy in 1987
arose not from the discovery of changed circumstances of a
single taxpayer or of a change in statutory law. The commis-
sioner simply attempted to change course and assess a large
number of banks back taxes and interest without prior
warning.

This is not to say that once a policy exists pursuant to reg-
ulation, guideline, instruction sheet, or other informal agency
action of general application, that the commissioner may
never change it. The commissioner might change policy to
cope with changes in Federal tax laws that affect Massachu-
setts tax filings, see, e.g., Tech. Info. Rel. 87-15, 3 Official
MassTax Guide at 412-413 (West 1995) (accounting
changes resulting from Tax Reform Act of 1986), or to ad-
dress changed circumstances in the business world, see, e.g.,
G. L. c. 62C, § 78 (1994 ed.) (filing of returns by electronic
means, rather than on forms); 830 Code Mass. Regs.
§ 62C.78.1 (1995). The commissioner's expertise in tax mat-
ters might even bring the commissioner to the conclusion

that a prior interpretation of a statute or regulation was wrong and should be changed. An instruction for filing returns may be incorrect. See 830 Code Mass. Regs. § 62C.3.1 (9) (c) (2). Procedures exist to make such changes. G. L. c. 62C, § 3 (1994 ed.) (authority to make regulations and rulings); G. L. c. 30A (prescribing procedures for formal rulemaking).[5]

In reversing the department's position on the deductibility of tax-exempt bond premiums, the commissioner changed policy without any public statement and simply issued notices of assessment. Those notices included demands for interest due because of alleged deficiencies in past tax years, with the claim of deficiency based only on the new previously unannounced policy.

We have recognized that a change in tax policy without prior notice to the public raises the "spectre of different assessment values." *Macioci, supra* at 763. It can shake public confidence, *id.*, because collection of back taxes based on new policy allows for selective assessment that is unfair to taxpayers. *Polaroid Corp.* v. *Commissioner of Revenue*, 393 Mass. 490, 496 (1984). The commissioner has recognized this in stating that the department issues various informal public written statements because "[c]learly articulated and widely communicated rules, standards and instructions are an important tool in achieving voluntary compliance with Massachusetts tax laws. They provide a public framework

---

[5]We need not address here whether a formal regulation, promulgated in accordance with G. L. c. 30A (1994 ed.), is needed to reverse policy embodied in an instruction sheet or other informal statement. See *Wellington* v. *Commissioner of Corps. & Taxation*, 359 Mass. 448, 452 (1971) (informal notice sent to taxpayers could not change prior interpretation; regulation would have been sufficient [dictum]).

The commissioner argues that the Instruction Sheet was erroneous. The department's own regulations recognize that forms and instructions cannot change the law. 830 Code Mass. Regs. § 62C.3.1 (9) (c) (2). Here, however, years have passed without correction of the alleged error. This is not a case in which an erroneous interpretation of a new law, a proofreading error, or misprint creeps into a form or instructions and is remedied by prompt reissue of new forms or other means of generally publicizing the change.

for honest, fair and firm tax administration." 830 Code Mass. Regs. § 62C.3.1 (1) (1994). The commissioner has ample tools with which to exercise his quasi legislative powers without resort to the notice of assessment sent without warning. We cannot sanction the retroactive application of a change in policy when the department itself made a clear policy statement to the contrary. For these reasons we affirm the decision of the Appellate Tax Board granting the abatements.

*So ordered.*