BANKBOSTON CORPORATION *vs.* COMMISSIONER OF REVENUE.

No. 05-P-1545.

Suffolk. September 20, 2006. - February 2, 2007.

Present: RAPOZA, C.J., LAURENCE & GRAINGER, JJ.

*Taxation,* Corporate excise. *Commissioner of Revenue. Trust,* Real estate trust,
     Distribution.

This court concluded that the decision of the Appellate Tax Board, that
     distributions of a real estate investment trust to a corporate shareholder
     were subject to the corporate excise tax for certain years, was based on the
     well-established principle of uniform application of tax provisions, both
     within the statutes of the Commonwealth and between Massachusetts and
     Federal law, absent apparent contrary legislative intent; followed the
     customary imposition of tax liability at a single point within corporate
     enterprises; and was consistent with the purpose underlying the creation of
     real estate investment trusts. [159-166]

APPEAL from a decision of the Appellate Tax Board.

*John S. Brown* (*Matthew D. Schnall* & *Donald-Bruce Abrams*
with him) for the trustee.

*Pierce O. Cray,* Assistant Attorney General, for the Commis-
sioner of Revenue.

GRAINGER, J. When is a dividend not a dividend, or at least
not treated as one for purposes of the corporate excise tax, G. L.
c. 63? This issue is presented in the context of State and Federal
measures intended to level the field of opportunity in real estate
investment.

BankBoston Corporation (bank) appeals from a decision of
the Appellate Tax Board (board) upholding the Commissioner
of Revenue's (commissioner) determination that distributions of
a real estate investment trust (REIT) to a corporate shareholder
were subject to the corporate excise tax for 1996 and 1997, the
years in question. We conclude that the board's decision is
solidly based on the well-established principle of uniform ap-

plication of tax provisions, both within the statutes of the Commonwealth and between Massachusetts and Federal law, absent apparent contrary legislative intent. In addition, the board's decision follows the customary imposition of tax liability at a single point within corporate enterprises, and is consistent with the purpose underlying the creation of REITs. Accordingly, we affirm.

*Background.* In 1960, Congress, with encouragement and prompting from the investment and money management industry, created REITs as another variation of so-called "pass-through" entities such as mutual funds and Subchapter S corporations. These constructs of Federal law are intended to provide access for individuals of moderate means to investments that had previously been out of reach due to economies of scale and tax considerations. H.R. Conf. Rep. No. 94-658 at 353 (1976), reprinted in 1976 U.S.C.C.A.N. 2897, 3249-3250. Congress determined that the usual imposition of tax on revenues when they are earned by REITs, and then again on those same earnings when they are distributed to individuals as dividends, amounted to unfair double taxation in the case of pass-through entities, where the investment entity was no more than the structural alter ego of the shareholders. For this reason, REITs achieve pass-through status for tax purposes via a special "dividends-paid" deduction, by which they can deduct from their own income the amount that they pay out to their beneficial owners. See 26 U.S.C. § 857(b)(2)(B) (2000).

REITs quickly attracted not only individuals of moderate means, but also sophisticated investors. Corporations, including bank holding companies,[1] perceived that the dividends-paid deduction enjoyed by REITs might in theory be combined with the so-called dividends-received deduction normally enjoyed by corporate parents.[2] The combination of these two deductions creates the issue in this case, where the recipient of the REIT's

---

[1]During the tax years 1996 and 1997, the REIT in this case, Matthews Street Real Estate Investment Trust, Inc., distributed $5,952,766 and $116,806,719, respectively, from its Federal taxable income to its corporate parent, Multibank Leasing Corp. (MLC). MLC, in turn, was a wholly-owned subsidiary of the bank.

[2]Traditional corporations do not enjoy the dividends-paid deduction because they and their shareholders are deemed to be distinct legal persons with cor-

distribution is itself a corporation. If a recipient corporation may invoke the usual dividends-received deduction for earnings paid to it by a REIT subsidiary, then the earnings would entirely escape taxation at the corporate level, because the REIT has already claimed the dividends-paid deduction on the same earnings. Congress closed this loophole by language that specifically denied REIT distributions "dividend" status for purposes of the dividends-received deduction. 26 U.S.C. § 243(d)(3) (2000).[3] Federal law thus imposes uniformity in the Federal taxation of earnings of corporate subsidiaries. Tax is paid, but only paid once, by the corporate family whether or not the subsidiary is a REIT. REIT distributions are taxed to the parent company to compensate for the dividends-paid deduction exempting REITs, while other distributions are taxed to the subsidiaries to compensate for the dividends-received deduction exempting the parent.

The Massachusetts corporate excise tax, G. L. c. 63, also recognizes that corporate revenues should be taxed only once regardless of subsequent transfers from subsidiary to parent. This goal is achieved through a somewhat more complicated three-step process not utilized by the Internal Revenue Code (Code).[4] At the conclusion of this process, the Massachusetts corporate taxpayer enjoys a deduction for dividends received

respondingly distinct tax obligations. However, Congress has recognized that when earnings of a corporate subsidiary are transferred to a parent or holding company before distribution to shareholders, imposition of tax at each stage would reach a level not just of double, but triple, taxation. To correct this problem, Federal tax law provides that the earnings are taxed at the subsidiary level but not to the parent. This is accomplished through the application of a *dividends-received deduction, relieving the parent of tax liability.* See 26 U.S.C. § 243(a) (2000).

[3]The loophole was precluded for Federal tax purposes in the same legislation which created REITs. Pub. L. 86-779, § 10(g) (1960). "For purposes of subsection (a) [which establishes the general dividends-received deduction] [a]ny dividend received from a *real estate investment trust . . . shall not be treated as a dividend."* 26 U.S.C. §§ 243(d)(3) (2000). Accord 26 U.S.C. § 857(c) (2000) ("For purposes of section 243 [relating to deductions for dividends received by corporations], a dividend received from a *real estate investment trust . . . shall not be considered as a dividend"*).

[4]The three *steps in the calculation process* are the determination of "gross income," "net income," and "taxable net income." "Gross income" is defined as that same phrase is "defined under the provisions of the Federal Internal Revenue Code." G. L. c. 63, § 30(3), as amended through St. 1992, c. 133,

from its subsidiaries essentially equivalent to that provided by the Code.[5] Unlike the Code, Massachusetts tax law contained no explicit reference to REITs during the tax years here at issue.[6] The dispute between the parties may be summarized as a disagreement whether Massachusetts law treated REIT distributions to a corporate shareholder in the same way as the Code during the years in question, despite the lack of explicit language providing for such treatment within the confines of G. L. c. 63.

*Discussion.* The commissioner asserted, and the board agreed, that G. L. c. 63 must be administered consistent with the definition of "dividend" provided for income tax purposes in G. L. c. 62, and consistent with Federal taxation of REITs. Reference to G. L. c. 62 presents the clear advantage of avoiding inconsistency between two chapters of the General Laws, both governing taxation. And, because G. L. c. 62 itself defines "dividend" by reference to the Code, it extends uniformity to Federal tax law at the same time. Specifically, it defines as " '[d]ividend', any item of Federal gross income which is treated as a dividend under the provisions of the Code." G. L. c. 62, § (1)(*e*), as amended through St. 1989, c. 287, § 46.

As stated above, the intended beneficiaries of REITs were individuals, not corporations already entitled to a dividends-received deduction. Consequently, the fundamental REIT structure, incorporating a single taxable event for the investor, required alteration when these unintended corporate beneficiaries with additional tax advantages entered the arena. The commis-

§ 400. There is thus no difference between State and Federal computation of gross income for corporate excise purposes.

The next step, determining "net income," generally consists of calculating "gross income less the deductions, but not credits, allowable under the provisions of the Federal Internal Revenue Code." G. L. c. 63, § 30(4), as amended through St. 1992, c. 133, § 401.

The third and final step after determining "net income" is calculating "taxable net income." G. L. c. 63, § 38(*a*). It is at this stage that Massachusetts law recognizes a dividends-received deduction. G. L. c. 63, § 38(*a*)(1).

[5]See G. L. c. 63, § 38(*a*)(1), added by St. 1974, c. 722, §§ 1, 2, providing a dividends-received deduction to apply to a (slightly) reduced ninety-five percent of dividends and to add three explicit exceptions, not relevant here.

[6]In 2003, the Legislature amended G. L. c. 63 to preclude any possibility of the argument advanced here by the bank. St. 2003, c. 4, § 14.

sioner argues that this alteration, found in 26 U.S.C. § 243(d)(3), providing that REIT distributions to corporate shareholders shall "not be treated as dividends," must be deemed also to be a part of Massachusetts law. This position is supported by the fact that the Legislature has not indicated that it intends to vary the treatment of REITs on a State level, and the Supreme Judicial Court "has consistently adhered to the meaning of Federal tax language incorporated into our tax law where no contrary legislative intent is apparent." *Commissioner of Rev.* v. *Franchi*, 423 Mass. 817, 823 (1996).

Both parties rely on two leading cases, *Commissioner of Rev.* v. *Northeast Petroleum Corp.*, 401 Mass. 44 (1987) (*Northeast Petroleum II*),[7] and *Dow Chem. Co.* v. *Commissioner of Rev.*, 378 Mass. 254 (1979) (*Dow Chemical*). These cases are instructive in that both dealt with a subsidiary's distributions that were not the usual type of dividends issued to a parent company. Consequently each decision set forth principles for determining whether a distribution qualified as a "dividend" and was therefore deductible under G. L. c. 63, which contained no definition of the term. The bank points to examples of deductions that were allowed despite the fact that, as in this case, they were precluded by the Code. In those instances, however, uniformity prevailed because some substitute to the relief afforded by deductions was provided by the Code. Our task in reviewing these decisions is to apply the principles they have enunciated rather than the specific relief they provided.

*Northeast Petroleum II* concerned a liquidating distribution received by a Massachusetts corporation from an out-of-State (Louisiana) subsidiary that had been dissolved. The court had previously ruled, in *Commissioner of Rev.* v. *Shafner*, 392 Mass. 256 (1984) (*Shafner*), that a liquidating distribution paid by a corporate trust qualified as a dividend in computing personal income tax under G. L. c. 62, the statute there at issue, because the Shafners were individual taxpayers who had been denied

---

[7]We refer herein to this decision as *Northeast Petroleum II* because it was issued after an appeal from a decision of the Appellate Tax Board following a remand from an appeal of its first decision. See *Northeast Petroleum Corp.* v. *Commissioner of Rev.*, 395 Mass. 207 (1985).

applications for abatement of income tax.[8] In *Northeast Petroleum II, supra* at 49, the court concluded that "[t]here is no distinction between the term 'dividend' as applied in *Shafner* under G. L. c. 62, and as used here under c. 63."

In 1987, when *Northeast Petroleum II* was decided, G. L. c. 62 contained a definition of "dividend" that allowed for a choice, referring either to any item of Federal gross income that was a "dividend" in 26 U.S.C. § 316, *or* any item of Federal gross income which was "treated as a dividend" anywhere else in the Code.[9] *Northeast Petroleum II, supra* at 47. The following year the definition was amended to provide, as it still does today, that under G. L. c. 62, any payment is considered a dividend if the Code treats it as one.[10] This revision signaled an unmistakable legislative intent to align Massachusetts tax law with treatment under the Code, regardless of terminology.[11]

Nevertheless, the bank cites *Northeast Petroleum II* as direct authority for the result it seeks here — complete State tax avoidance. The decision allowed a deduction in Massachusetts for a liquidating distribution made to a corporate shareholder just as the bank would have us allow a deduction for REIT distributions in this case. However, the court in *Northeast Petroleum II* was very clear in its pursuit of uniformity. In addi-

---

[8]In *Shafner*, 392 Mass. at 260-261, the court noted the pass-through nature of the corporate trust at issue, observed that the Code imposed a one-time Federal tax at the shareholder level, and concluded that because Massachusetts had already imposed its one-time tax at the trust level it would treat the subsequent distribution as a dividend excludable from the shareholder's taxable income.

[9]"Under G. L. c. 62, § 1(*e*) (1986 ed.), a dividend is defined as 'any item of federal gross income which is a dividend under [§ 316] of the Code or which is treated as a dividend under any other provision of the Code.' " *Northeast Petroleum II, supra* at 47.

[10]As previously noted, § 1(*e*) of G. L. c. 62, as amended through St. 1989, c. 287, § 46, now defines "dividend" as "any item of federal gross income which is treated as a dividend under the provisions of the Code."

[11]We decline to adopt the bank's result-oriented assertion that *Northeast Petroleum II*'s comprehensive endorsement of uniformity is limited to the version of G. L. c. 62 in effect at the time that decision was rendered. That interpretation would allow the bank, in 1996 and 1997, to select the more desirable option from a previous version of the statute, superseded nine years earlier. See, e.g., *Commissioner of Rev.* v. *Franchi*, 423 Mass. at 824 (general premise underlying incorporation of Federal tax law into Massachusetts tax statute is fact that Federal definitions may vary from year to year).

tion to finding "no distinction" between the use of the term dividend in G. L. c. 62 and c. 63, the court specifically noted that in *Shafner* (under c. 62) and in the board's determination in *Northeast Petroleum II* (under c. 63), "[b]oth entities paid State taxes, although in this case the State receiving the tax was Louisiana." *Northeast Petroleum II*, 401 Mass. at 47.

Just as *Northeast Petroleum II* emphasized uniformity between G. L. c. 62 and c. 63, the Supreme Judicial Court's earlier decision in *Dow Chemical*, 378 Mass. 254, provides strong support for uniform interpretation of State and Federal tax provisions. There the court upheld a Massachusetts dividend deduction for income from a foreign subsidiary, notwithstanding the fact that the Federal deduction applied only to domestic subsidiaries. The court noted that the Code provided a credit for foreign taxes imposed on offshore subsidiaries, and that this credit provided the same relief from multiple taxation of offshore earnings in the Federal scheme as the dividends-received deduction provided in G. L. c. 63. "The corporate excise, by allowing a deduction for dividends from [foreign] subsidiaries . . . performs the same general function in the State scheme as does the foreign tax credit in the Federal scheme. We have no warrant for destroying this symmetry by arbitrarily ruling foreign dividends out of the dividends category altogether." *Id.* at 269 (footnote omitted).

In another disputed context, the court in *Dow Chemical* endorsed uniformity (or "symmetry") not only to equalize tax reduction, but also to remedy the issue we address in this case — tax avoidance. Because the parent company in *Dow Chemical* did not always receive dividends in the same year that the revenue in question was earned by the subsidiary, the court was faced with a timing issue, as follows: "gross income" under Massachusetts law was defined, as it is today, as equivalent to "gross income . . . under the provisions of the Federal Internal Revenue Code, as amended, *and in effect for the taxable year*" (emphasis added). *Id.* at 258, quoting from G. L. c. 63, § 30(5)(*a*). On the basis of this language, the parent company argued that it was not obliged to recognize subsidiary revenues as income unless they were upstreamed in the same tax

year, but could still deduct them whenever they were received. Again stressing uniformity of tax treatment, the court rejected that approach, pointing to G. L. c. 63, § 30(5)(*a*), as reflecting "a legislative intent, running through many State tax provisions, to assure uniformity between State and Federal taxation." *Id.* at 264 (footnote omitted).[12]

In *Dow Chemical*, the court also cited the importance of uniformity between G. L. c. 62 and c. 63. After quoting the definition of "dividend" in G. L. c. 62, § (1)(*e*), the court observed that its rejection of the commissioner's assertions with respect to foreign dividends was also based on the fact that any other interpretation "would thus result in a disparity in the definitions of dividend in c. 62 and c. 63." *Id.* at 269 n.16.[13]

The bank has also advanced an argument based on the tax computation forms issued by the commissioner for the years in question. The bank characterizes Form 355C-A, Schedule E-1, and their instructions as a "policy" for purposes of G. L. c. 62C, § 26(*j*)(1), which prohibits any assessment if it is based on a "change in policy" not previously announced.[14] The language in the tax form is no more than a description of the Com-

---

[12]The court's endorsement, in *Dow Chemical, supra*, of uniformity applied regardless of which party might benefit: on the one hand, it upheld the taxpayer's entitlement to a deduction for foreign dividends, while on the other, it required recognition of revenue as income regardless of the year in which it was transferred to the parent company.

[13]In our application of settled principles found in case law, we do not reject one other established tenet, that any ambiguity in the law must be resolved in favor of the taxpayer. *Cabot* v. *Commissioner of Corps. & Taxn.*, 267 Mass. 338, 340-341 (1929). *Commissioner of Rev.* v. *Oliver*, 436 Mass. 467, 473 (2002). This principle is applied regularly to statutory language susceptible of more than one interpretation. Here we are faced, not with ambiguous language, but rather with the same absence of language specifically confronted by the court in *Dow Chemical, Shafner*, and the two *Northeast Petroleum* cases. Contrast *Cabot* v. *Commissioner of Corps. & Taxn., supra*; *DiStefano* v. *Commissioner of Rev.*, 394 Mass. 315, 327 (1985); *Dining Mgmt. Servs., Inc.* v. *Commissioner of Rev.*, 404 Mass. 335, 338 (1989); *Commissioner of Rev.* v. *Molesworth*, 408 Mass. 580, 581-583 (1990); *Commissioner of Rev.* v. *Oliver, supra* at 469-471; *Ogden Suffolk Downs, Inc.* v. *Boston*, 18 Mass. App. Ct. 101, 105 (1984); *Destito* v. *Commissioner of Rev.*, 23 Mass. App. Ct. 977, 977-978 (1987).

[14]General Laws c. 62C, § 26 (*j*)(1), as inserted by St. 1998, c. 485, § 11, provides in pertinent part: "The commissioner shall not make any assessment

monwealth's mechanism used to trigger the dividends-received deduction, which is different from that used by the Code. See Instructions to Schedule E-1, "Dividends Deduction." The form, in any event, begs the question here at issue, namely, whether to treat a REIT distribution as a dividend from the outset. Since the tax form does not address that issue, the commissioner's position in this case cannot be characterized as a change from the form.

We acknowledge the accuracy of the bank's assertion that the steps provided in the form itself for the calculation of the excise tax result in the deduction of REIT distributions.[15] Contrary to the bank's position, however, the mathematical effect of the insertion of numbers into a formula, accompanied by no more than instructions for doing so, does not constitute formulation of a policy.[16] See *State Tax Commn.* v. *Sears Roebuck & Co.*, 344 Mass. 471, 473-474 (1962) (commissioner not limited to factors in valuation formula used in tax forms issued by

under this chapter if that assessment is based on a change in policy unless such change in policy first is announced to taxpayers pursuant to the promulgation of a validly adopted regulation or the issuance of a technical information release, directive, administrative procedure or other similar public statement of equivalent formality that explains the change in policy." The specific meaning of this prohibition is specified in G. L. c. 62C, § 26(j)(2), which defines "an assessment . . . based on a change in policy" as "contrary to a rule of law or the interpretation of a rule of law set forth in a regulation, technical information release, directive, administrative procedure, tax form, including instructions, or any other written guidance issued by the commissioner."

[15]The commissioner offers no explanation for the inconsistency between the calculus on his form and his legal position. It seems clear that the Department of Revenue took a misstep here, inadvertently providing corporate taxpayers with a rationale to justify deduction of REIT distributions on their 1996 and 1997 tax returns. We note with approval that the commissioner did not assess penalties here, and that counsel for the commissioner conceded at oral argument that penalties would not be appropriate in this case.

[16]Administrative interpretation of a law or regulation requires a modicum of intent and is defined as "[a]n interpretation *given* to a law or regulation by an administrative agency" (emphasis added), Black's Law Dictionary 837 (8th ed. 2004), and as "the ascertainment of the meaning of the maker of a written document." *Markman* v. *Westview Instruments, Inc.*, 52 F.3d 967, 1001 (Fed. Cir. 1995) (Newman, J., dissenting), aff'd, 517 U.S. 370 (1996), quoting from *In re Union Trust Co.*, 89 Misc. 69 (N.Y. Sur. 1915). The element of intent (combined with expertise) provides one basis for the deference which is enjoyed by administrative interpretation, a deference certainly not appropriate to inadvertent behavior.

department). We therefore conclude that neither the language of the tax forms nor the method of calculating tax set out on the forms constitute a policy triggering the requirements of G. L. c. 62C, § 26(j).[17]

Finally, the parties differ on the purported ability of the Legislature to have "clarified" the tax status of REIT distributions retroactively by the enactment of St. 2003, c. 4, § 14. Because we conclude that consideration of any such legislative "clarification" is unnecessary to our determination that REIT distributions did not enjoy a dividends-received deduction in 1996 and 1997, we do not reach this issue.[18]

*Conclusion.* "The corporate excise statute provides no definition of 'dividend' and we have some liberty to follow the reason of the thing." *Dow Chemical*, 378 Mass. at 269 (footnote omitted). We conclude that the commissioner possessed substantial basis for his interpretation of G. L. c. 63's treatment of REIT distributions which, consequently, was upheld by the board. Our review of the board's decision, in turn, is made "in the light of its expertise and the traditional deference due its decisions." *Northeast Petroleum Corp.* v. *Commissioner of Rev.*, 395 Mass. 207, 214 (1985).

The thrust of the dividends-received deduction in the Massachusetts corporate excise has been to impose a unified tax on a corporate enterprise, recognizing that affiliates and subsidiaries should not create additional liability by transferring revenues within the family. However, the elimination of all corporate excise by importing the dividends-received deduction to REIT ownership distorts the careful balancing by which corporations

[17]We concur with the board that the bank's reliance on *Commissioner of Rev.* v. *Baybank Middlesex*, 421 Mass. 736 (1996), is misplaced. The case, which predated the effective date of G. L. c. 62C, § 26(j), involved an instruction sheet for bank excise returns which verbally and explicitly addressed the issue in dispute, and which had been in use without change for more than forty years. It stands in strong contrast to this case, which involved no direct prior statement, followed by an effort to prevent an unanticipated inappropriate use of a deduction.

[18]Retroactive clarification of this nature has "very little, if any significance." *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 860 (1986), quoting from *United States* v. *Southwestern Cable Co.* 392 U.S. 157, 170 (1968). But see *Fitz-Inn Auto Parks, Inc.* v. *Commissioner of Labor & Indus.*, 350 Mass. 39 (1965), and *Swift* v. *AutoZone, Inc.*, 441 Mass. 443, 449-450 (2004).

are intended to be taxed no more than once, but certainly once, within the corporate family. An interpretation which at one stroke eliminates all tax to a corporation and its affiliates misapplies the leveling purpose of REITs, defeats uniformity between Massachusetts and Federal law, and creates inconsistency between chapters 62 and 63 of the General Laws. These requirements, especially that of uniformity, are well established in Massachusetts tax law and preclude any contention that an error in methodology provided by a tax form can reasonably be construed as a policy to the contrary.

*Decision of the Appellate Tax Board affirmed.*