## BIOGEN IDEC MA, INC. *vs.* TREASURER AND RECEIVER GENERAL.

Suffolk. April 7, 2009. - July 2, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Abandoned Property. Treasurer and Receiver General. Administrative Law,*
Agency's interpretation of regulation, Judicial review, Regulations, Retroactive effect of regulation. *Statute,* Construction. *Words,* "Outstanding credit balances."

This court concluded that where the predecessor to the current Treasurer and Receiver General (Treasurer), in promulgating regulations interpreting the "outstanding credit balances" exemption in G. L. c. 200A, § 5, for purposes of determining abandoned property, maintained an internal policy of applying the outstanding credit balance exemption to uncashed accounts payable checks, the current Treasurer was bound by that policy with regard to an audit that was underway when the current Treasurer adopted new regulations concerning the outstanding credit balance exemption [183-186]; further, the statute, which did not define "outstanding credit balance" and was open to more than one rational interpretation, was properly the subject of agency rule making, and the predecessor Treasurer's regulations were reasonable [186-189]; finally, the predecessor Treasurer's regulations did not suffer from any defect requiring a curative regulation (and retroactive application of that new regulation in the audit at issue) [189-191].

CIVIL ACTION commenced in the Superior Court Department on January 17, 2006.

The case was heard by *Allan van Gestel,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*David A. Guberman,* Assistant Attorney General, for the defendant.

*Daniel W. Halston (Megan Barbero* with him) for the plaintiff.

*Ben Robbins, Martin J. Newhouse, & Jo Ann Shotwell Kaplan,* for New England Legal Foundation & another, amici curiae, submitted a brief.

SPINA, J. This appeal requires us to determine which set of regulations promulgated by different Treasurers of the Commonwealth defining the phrase "outstanding credit balances," see G. L. c. 200A, § 5 (outstanding credit balance exemption), applies to certain uncashed checks issued by Biogen IDEC MA, Inc. (Biogen), for purposes of the abandoned property laws, codified at G. L. c. 200A (c. 200A).[1] Treasurer Shannon O'Brien first promulgated regulations interpreting "outstanding credit balances" in 2001. See 960 Code Mass. Regs. §§ 4.00 (2001). Her successor, Treasurer Timothy Cahill, amended those regulations in 2004. See 960 Code Mass. Regs. §§ 4.00 (2004).

In 2003, Treasurer Cahill initiated an audit of Biogen's records to determine whether it had complied with c. 200A. See G. L. c. 200A, § 12 (*a*). In 2005, an independent auditor, using the amended regulations, concluded that Biogen should have reported $781,251.34 in uncashed accounts payable checks as abandoned property from 1984-2004. Biogen appealed from the auditor's findings, see G. L. c. 200A, § 12 (*g*), arguing, inter alia, that the amended regulations could not be applied retroactively. A deputy treasurer concluded that the amended regulations could be applied retroactively because they were necessary to correct the definition of "outstanding credit balances" in the original regulations, which he believed was overly broad and in conflict with the statute's language. The deputy treasurer's decision was affirmed by the Treasurer's designee. See G. L. c. 200A, § 12 (*h*).

Biogen appealed from the Treasurer's final decision to the Superior Court, see G. L. c. 200A, § 12 (*i*), seeking declaratory relief stating that the amended regulations could not be applied retroactively. Biogen did not dispute that the original regulations, on their face, did not exempt uncashed accounts payable checks, but argued that it was Treasurer O'Brien's policy to interpret the regulations as extending the outstanding credit balance exemption to such checks. In support of this contention, Biogen offered electronic mail messages (e-mails) it received from Treasurer Cahill

---

[1]General Laws c. 200A, § 5, provides, in relevant part:

"Notwithstanding the provisions of the preceding paragraph, any outstanding credit balances to a vendor or commercial customer from a vendor resulting from a transaction occurring in the normal and ordinary course of business shall be exempt from the provisions of this chapter."

indicating that Treasurer O'Brien in fact did have a policy of applying the outstanding credit balance exemption to uncashed accounts payable checks. A Superior Court judge allowed Biogen's motion for judgment on the pleadings, vacated the final agency decision, and entered judgment for the Treasurer as to a portion of the auditor's findings that Biogen did not dispute. The Treasurer appealed and we transferred the case to this court on our own motion. We affirm.[2]

1. *Background.* Chapter 200A sets forth a comprehensive scheme governing the disposition of abandoned property. The purposes of c. 200A include protecting true owners' rights, bringing additional revenues to the treasury, and providing a procedure for the transfer of abandoned property. *Treasurer & Receiver Gen.* v. *John Hancock Mut. Life Ins. Co.*, 388 Mass. 410, 423-424 (1983). Pursuant to G. L. c. 200A, § 5:

> "[A]ll intangible personal property not otherwise presumed to have been abandoned under any other section of this chapter, including but not limited to all certificates of ownership, dividends, stocks, bonds, money, drafts and claims for money and credits, except deposits and the increments thereon referred to in [§ 3] that are held or owing in the commonwealth in the ordinary course of the person's business, including all such property held by any fiduciary, shall be presumed abandoned unless claimed by the beneficiary or person entitled thereto within three years after the date prescribed for payment or delivery."

Property presumed abandoned must be reported to the Treasurer in accordance with G. L. c. 200A, § 7.[3] The holder of abandoned property must additionally "pay or deliver to the treasurer at the time of filing the report all property presumed abandoned specified in the report." G. L. c. 200A, § 8A (*a*). The failure to

---

[2] We acknowledge the amicus brief submitted in support of the plaintiff by the New England Legal Foundation and Associated Industries of Massachusetts.

[3] General Laws c. 200A, § 7, provides, in relevant part:

"(*a*) Every person holding property declared by this chapter to be presumed abandoned shall report to the treasurer as provided in this section. . . .

"(*d*) The report shall be filed no later than November first of each year as of June thirtieth or the end of the fiscal year next preceding . . . ."

comply with the reporting and property surrender provisions may result in, among other things, see G. L. c. 200A, § 12 (*d*), (*e*), a penalty of not more than $500. G. L. c. 200A, § 12 (*c*). General Laws c. 200A, § 13A, authorizes the treasurer to "to make necessary rules and regulations to carry out the provisions of this section."

In 2000, the Legislature enacted St. 2000, c. 198, "An Act relative to abandoned property," and added the following exemption to G. L. c. 200A, § 5:

> "Notwithstanding the provisions of the preceding paragraph, *any outstanding credit balances to a vendor or commercial customer from a vendor resulting from a transaction occurring in the normal and ordinary course of business shall be exempt from the provisions of this chapter.* This exemption shall not apply to unallocated distributions from securities held by financial intermediaries including, but not limited to, brokers, mutual funds, custodians, trust companies and depositories and owing to unknown beneficiaries but held in the intermediary's nominee names."[4] (Emphasis added.)

St. 2000, c. 198, § 2 (outstanding credit balance exemption).

The act introducing the exemption also established an amnesty period during which holders of abandoned property would not, in certain circumstances, be subject to penalties, fines, or interest on unreported abandoned property, St. 2000, c. 198, § 4, and required the Treasurer to "conduct an outreach and publicity program to notify business entities and other holders of abandoned property of their obligations under the General Laws, and the amnesty program." *Id.*

Following enactment of the outstanding credit balance exemption, then-Treasurer Shannon O'Brien promulgated implementing

---

[4]This act also directed the treasurer to "prepare a report of the activities, procedures, performance, operation and implementation of the abandoned property system established by this act; provided that, the treasurer in preparing the report shall consult with the Massachusetts Bankers Association, the Associated Industries of Massachusetts, the Massachusetts Hospital Association and ACS Unclaimed Property Clearinghouse, Inc. The report shall be filed with the committees on ways and means and the judiciary of the house of representatives and of the senate." St. 2000, c. 198, § 5.

It is unclear whether such a report has ever been filed.

regulations. Pursuant to those regulations, credit balances shall include, but not be limited to:

> "[A]ny outstanding credits; overpayments; refunds; vouchers; accumulated value in the form of points, discounts, or other incentive type programs; or *any other value potentially due and owing to a vendor or commercial customer; whether currently remaining as a credit, previously resolved, revised, expired, or issued to the vendor or to a commercial customer as a credit memo or repayment.* Credit balances shall pertain to credits either current or past that are or were owing to a vendor or commercial customer, whether or not those vendors or commercial customers are currently determinable. Credit balances as used in 960 [Code Mass. Regs. §§] 4.00 shall not include consumer retail credits." (Emphasis added.)

960 Code Mass. Regs. § 4.02 (2001).

Title 960 Code Mass. Regs. § 4.03(13) (2001) further provided:

> "(a) [A]n exemption shall exist for any outstanding credit balances between vendors or commercial customers resulting from a transaction occurring in the normal and ordinary course of business. This exemption shall apply to all prior and current reporting years.
>
> "(b) Credit balances, as defined in 960 [Code Mass. Regs. §] 4.02, shall not be considered abandoned property, in accordance with G. L. c. 200A, § 5. Credit balances, when they arise in the normal and ordinary course of business, may originate from activity such as overpayments, payment mis-postings, volume discounting, customer relations programs, and payments to satisfy other obligations between two commercial customers, and may take the form of credits, credit memos, refunds, vouchers, discount points or programs, and other transactions between the parties."[5]

---

[5] A "[c]ommercial [c]ustomer" was "[a]ny person who purchases goods or services in connection with the conduct of that person's business within Massachusetts or through a vendor conducting business in Massachusetts. No individual purchasing goods or services in his/her capacity as a consumer at retail shall be considered a commercial customer." 960 Code Mass. Regs. § 4.02 (2001).

Seeking to avail itself of the amnesty period, Biogen retained a consultant to bring it into compliance with c. 200A. By October, 2002, Biogen had reported $220,308.74 in abandoned property, omitting certain sums it believed fell within the outstanding credit balance exemption.

By a notice dated September 17, 2003, the deputy treasurer of abandoned property, Mark Cavanagh, informed Biogen that Treasurer Cahill[6] was invoking his right to examine Biogen's records to determine whether Biogen had complied with the reporting requirements, see G. L. c. 200A, § 12 (*a*) ("The treasurer may at any reasonable time and upon reasonable notice examine the records of any person to determine if said person has complied with the provisions of the chapter"), and had retained Kelmar Associates, LLC (Kelmar), an independent accounting firm, to serve as an auditor on the Treasurer's behalf.

On February 12, 2004, while Biogen's audit was underway, Treasurer Cahill filed a notice of the adoption of emergency amendments concerning the outstanding credit balance exemption. See G. L. c. 30A, § 2, fifth par. The emergency regulations defined "credit balances" differently from the original regulations,[7] and changed the circumstances in which the outstanding credit balance exemption applied.[8] On June 18, 2004, Treasurer Cahill filed the final version of the amendments, which are nearly identical

---

[6]Treasurer Timothy Cahill was elected in 2002.

[7]Pursuant to the emergency regulations, "[c]redit [b]alances" were defined as:

> "Outstanding balances that are recorded as current accounts receivable of a holder. The balance must have been generated in the normal and ordinary course of business between the holder and a current commercial customer."

[8]The emergency regulations provided that the outstanding credit balance exemption would apply as follows:

> "(a) Pursuant to the reporting requirements detailed in [] G. L. c. 200A, §§ 5 and 7, an exemption shall exist for any outstanding credit balance or merchandise credit between vendors or commercial customers resulting from a transaction occurring in the normal and ordinary course of business.

> "(b) Credit balances, as defined in 960 [Code Mass. Regs. §] 4.02, shall not be considered abandoned property, in accordance with [] G. L. c. 200A, § 5. Credit balances, when they arise in the normal and ordinary

to the emergency regulations. Pursuant to the final amended regulations, "[c]redit [b]alances" are:

> "Outstanding balances that are recorded as current accounts receivable or accounts payable of a holder. The balance must have been generated in the normal and ordinary course of business between the holder and a then current commercial customer."

960 Code Mass. Regs. § 4.02 (2004). The amended regulations further provide that the credit balance exemption applies in the following circumstances:

> "(a) Pursuant to the reporting requirements detailed in [] G. L. c. 200A, §§ 5 and 7, an exemption shall exist for any outstanding credit balance or merchandise credit between vendors or commercial customers resulting from a transaction occurring in the normal and ordinary course of business.

> "(b) Credit balances, as defined in 960 [Code Mass. Regs. §] 4.02, shall not be considered abandoned property, in accordance with [] G. L. c. 200A, § 5. Credit balances may originate from activities such as customer overpayments and shall include balance sheet credits, such as the payment to vendors for the purchase of goods and services."

960 Code Mass. Regs. § 4.03(13)(a), (b) (2004).[9]

The amended regulations differ in two important respects from the original regulations. First, pursuant to the original regulations, a credit balance included, inter alia, "any other value potentially due and owing to a vendor or commercial customer; whether currently remaining as a credit, previously resolved, revised, expired,

---

course of business may only originate from activity such as customer overpayments and payment mispostings."

The emergency regulations defined a "[c]ommercial [c]ustomer" as "[a]ny person who maintains a current and ongoing commercial relationship with a vendor in the conduct of the person's business within Massachusetts or through a vendor conducting business in Massachusetts. No individual purchasing goods or services in his/her capacity as a consumer at retail shall be considered a commercial customer."

[9]Neither party argues that the differences between the emergency regulations, see notes 7 and 8, *supra*, and the final amended regulations bear on the resolution of this case.

or issued to the vendor or to a commercial customer as a credit memo or repayment." 960 Code Mass. Regs. § 4.02 (2001). The definition of "[c]redit [b]alances" pursuant to the amended regulations, in contrast, is much more limited in that it only includes credit balances that "are recorded as current accounts receivable or accounts payable of a holder." 960 Code Mass. Regs. § 4.02 (2004). Second, while the original regulations exempted credit balances "pertain[ing] to credits either current or past that are or were owing to a vendor or commercial customer," 960 Code Mass. Regs. § 4.02 (2001), the amended regulations allow an outstanding credit balance exemption only if the credit balances "are recorded as current accounts receivable or accounts payable of a holder." 960 Code Mass. Regs. § 4.02 (2004).[10]

Kelmar completed its audit in June, 2005. Its report differentiated between abandoned property that Biogen should have reported from 1984-2004 and abandoned property that would be reportable as of November 1, 2005. Utilizing the amended regulations, Kelmar's audit concluded that Biogen had not reported $1,234,601.50 in uncashed checks from July, 1984, through June 30, 2004. Of this amount, $781,251.34 was attributable to uncashed accounts payable checks.[11,12] Kelmar determined that Biogen voided checks that remained uncashed one year after their issuance "by debiting cash and crediting the appropriate expense account." In other words, Biogen's cash account was debited, or increased, see C.H. Meyer, Accounting and Finance for Lawyers 22 (3d ed. 2006), by the amount of the uncashed checks and the appropriate expense account was credited, or reduced. See *id.*[13] Biogen did not recredit accounts payable when it voided an

---

[10]Also, the original regulations exempted any credit balance "resulting from a transaction occurring in the normal and ordinary course of business." 960 Code Mass. Regs. § 4.03(13)(a) (2001). The amended regulations, however, limit the outstanding credit balance exemption to any holder "who maintains a current, multiple transaction, commercial relationship with a vendor in the conduct of the person's business within Massachusetts or through a vendor conducting business in Massachusetts." 960 Code Mass. Regs. § 4.02 (2004).

[11]At the time of the audit, Biogen did not have all its records dating back to 1984. As a result, Kelmar's determination that Biogen had retained $781,251.34 in uncashed checks was based on data extrapolated from Biogen's available records. Biogen does not dispute the methodology used by Kelmar.

[12]The remaining amount, $453,350.16, consisted of uncashed payroll checks, and are not at issue in this appeal.

[13]Kelmar also concluded that Biogen would be required to report $185,659.47

uncashed check, which would have, for accounting purposes, reflected Biogen's outstanding obligation to the payee of a check.

Biogen appealed from Kelmar's findings to the assistant State treasurer of the abandoned property division, see G. L. c. 200A, § 12 (*g*), arguing that the amounts attributable to accounts payable fell within the outstanding credit balance exemption. After a hearing, Deputy Treasurer Cavanagh issued a decision affirming Kelmar's findings, reasoning that the Legislature intended the outstanding credit balance exemption to "protect businesses in the limited circumstance when less than diligent bookkeeping left them with an unexplained credit on their accounts." He explained that such a case might arise "where a vendor delivers more goods than were described on the invoice, and the purchaser merely pays the amount on the invoice, or where the purchaser pays less than the prescribed amount for inventory control purposes." In his view, the original regulations exceeded the limited bounds contemplated by the Legislature when it enacted the exemption, and the amended regulations correctly construed the outstanding credit balance exemption.[14] Having concluded that the original regulations were inconsistent with the statute, he dismissed Biogen's assertion that the original regulations governed its audit.

Biogen then filed a petition for further administrative review. See G. L. c. 200A, § 12 (*h*).[15] A designee of the Treasurer affirmed the deputy treasurer's decision, incorporating his findings and conclusions as her own.

---

before or on November 1, 2005, some of which was attributable to uncashed checks from accounts payable. The amount reportable as of November 1, 2005, is not at issue in this appeal.

[14]The deputy treasurer dismissed Biogen's contention that the emergency amendments to the regulations were not properly issued pursuant to G. L. c. 30A, § 3, and that there was no notice of the permanent amendments. He reasoned that the emergency regulations were necessary for the preservation of the public health, safety, or general welfare, insofar as they would protect against "the potential loss of property rights by businesses and citizens of the Commonwealth of Massachusetts," and that the final amendments to the regulations were published in the Boston Globe, the Boston Herald, and the Massachusetts Register.

[15]General Laws c. 200A, § 12 (*h*), provides:

> "A holder aggrieved by the decision of the assistant treasurer of the abandoned property division may, within 30 days of the receipt of such decision, file a written petition for review, on a form prescribed by the

Biogen appealed from the Treasurer's final decision to the Superior Court, see G. L. c. 200A, § 12 (*i*), seeking a declaration that the original regulations applied to the portion of its audit concerning uncashed accounts payable checks issued between 1984 and 2004, that the uncashed accounts payable checks were not reportable pursuant to the outstanding credit balance exemption under the original regulations, and therefore, that it did not owe the Treasurer $781,251.34. A Superior Court judge allowed Biogen's motion for judgment on the pleadings. Judgment entered for the Commonwealth in the amount of $56,094, which represented uncashed accounts payable checks that were not paid to "commercial customers." See note 5, *supra.* The Treasurer appealed.

2. *Discussion.* a. *Interpretation of the outstanding credit balance exemption pursuant to the original regulations.* The crux of the Treasurer's appeal is that G. L. c. 200A, § 5, second par., unambiguously exempts only outstanding liabilities appearing as credit balances on a business's accounting records. In keeping with this interpretation, he construes the definition of credit balance under the original regulations as excluding uncashed accounts payable checks not appearing as credit balances on a business's accounting books because that definition does not, on its face, include such checks. See 960 Code Mass. Regs. § 4.02 (2001). In any event, he asserts, even if the original regulations construing the outstanding credit balance exemption could be interpreted to include uncashed accounts payable checks and even if it were the policy of his predecessor to construe the regulations in that manner, her policy conflicted with G. L. c. 200A, § 5, second par.

Contrary to the Treasurer's contention that such checks cannot be read into the original regulatory definition of "credit bal-

treasurer, with the treasurer or his appointee. Said petition shall include a summary of the facts presented to the assistant state treasurer of the abandoned property division, a copy of the assistant treasurer's decision, the issue in dispute, and any other relevant information. Within 45 days of receipt of the petition, the state treasurer or his appointee, shall either affirm or amend the decision of the assistant state treasurer. The treasurer's decision shall be in writing and sent by first class mail to the holder and any interested parties stating the decision and outlining the reasons therefor."

ance," the regulation employs broad, nonexclusive language. See 960 Code Mass. Regs. § 4.02 (2001) (credit balances "[s]hall include, *but not be limited to . . .* any other value potentially due and owing to a vendor or commercial customer" [emphasis added]). The breadth of "credit balances" under 960 Code Mass. Regs. § 4.02 (2001) clearly reserves to the Treasurer's policy-making discretion any determination concerning the exemption's applicability to obligations not specifically referenced in the regulation. Therefore, the pivotal threshold question is whether Treasurer O'Brien interpreted the regulation as exempting uncashed accounts payable checks issued to satisfy credit balances.

Normally, the application of a regulation to the particular facts of a case is within an agency's discretion and we accord an agency's interpretation of its own regulations substantial deference. See *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 782 (1980), and cases cited. In this deferential posture, we would ordinarily overturn the Treasurer's interpretation, which excludes such checks from the definition of "credit balances" under the original regulations, only if it was arbitrary, unreasonable or inconsistent with the plain terms of the regulation itself. See *id.* This case stands on somewhat different footing because the regulations in question were promulgated by Treasurer Cahill's predecessor, Treasurer O'Brien, and there is a question whether Treasurer O'Brien interpreted the regulatory definition of "credit balance" to include uncashed accounts payable checks. Ascertaining whether the former Treasurer implemented such a policy is critical because it bears on whether Treasurer Cahill may now impose a different interpretation retroactively. If Treasurer O'Brien did not include uncashed accounts payable checks under the outstanding credit balance exemption, then Treasurer Cahill's interpretation of the original regulation would govern. If, on the other hand, Treasurer O'Brien had a policy of applying the outstanding credit balance exemption to uncashed accounts payable checks, Treasurer Cahill's position would represent a departure from past policy and raise retroactivity concerns. See *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g*, 387 Mass. 372, 379 (1982) ("We recognize, of course, that the application of new principles or standards announced in a decision may be so unfair as to amount to an abuse of discretion"). In the latter case,

we would necessarily have to consider the Treasurer's contention that such a policy was inconsistent with the statute.

Our treatment of this issue is further complicated by the motion judge's consideration of e-mail correspondence between Treasurer Cahill's associate general counsel, Thomas McAnespie,[16] and Deputy Treasurer Cavanagh, stating that it was Treasurer O'Brien's "internal policy" to construe the outstanding credit balance exemption as "extend[ing] to any uncashed accounts payable checks if the holder could demonstrate that the check emanated from what once appeared on the books of the holder as a credit balance."[17] Biogen received the e-mail correspondence between McAnespie and Cavanagh pursuant to a document request during proceedings in the Superior Court and later submitted them to the judge.[18] Treasurer Cahill claims that he objected to the admission of these e-mails at the hearing on Biogen's motion for judgment on the pleadings, arguing that G. L. c. 30A limited judicial review of the decision below to the administrative record.[19] The transcript of that hearing has not been included in the record on appeal, which leaves us unable to determine whether the Treasurer's objection was properly preserved, the judge's precise ruling, and the basis for his ruling.[20] Consequently, we

[16]Thomas McAnespie served as associate general counsel under Treasurer Shannon O'Brien.

[17]In that electronic mail message (e-mail), McAnespie also contended that Treasurer Cahill's administration would not be bound by that internal policy and offered his opinion that after a credit balance has been reduced to a check, the exemption should not apply. He closed the e-mail asking, "Let me know if you think we should revisit this interpretation and *as a result advise holders differently than we have previously*" (emphasis added). Cavanagh responded, agreeing that the exemption "was never meant to be extended to cases where the credit was reduced to a check, then subsequently not cashed." He also mentioned that he had "fought against the credit balance giveaway to no avail."

[18]The record on appeal contains no indication that the Treasurer disputed the propriety of Biogen's document request.

[19]Biogen filed a motion in the Superior Court to supplement the administrative record with materials provided by Biogen to Kelmar. That motion was denied on the ground that Biogen had not offered those materials during the administrative proceedings below. See G. L. c. 30A, § 14 (5) (judicial review "shall be conducted by the court without a jury and shall be confined to the record"). The e-mail correspondence between Thomas McAnespie and Mark Cavanagh was not part of Biogen's motion to supplement the administrative record.

[20]Biogen contends that the e-mails are properly before us because the Treasurer

cannot say that consideration of these e-mails to establish that
Treasurer O'Brien applied the outstanding credit balance exemp-
tion to uncashed accounts payable checks was error. See *State
Line Snacks Corp.* v. *Wilbraham*, 28 Mass. App. Ct. 717, 720
(1990).[21]

In any event, Treasurer Cahill does not dispute that Mc-
Anespie's e-mail indicates that it was Treasurer O'Brien's internal
policy to apply the outstanding credit balance exemption to un-
cashed checks. To the extent he argues that he is not bound by
Treasurer O'Brien's internal policy, we disagree. "Although
courts give the force of law only to formal agency regulations,
administrative agencies must abide by their own internally prom-
ulgated policies." *Commissioner of Revenue* v. *BayBank Middle-
sex*, 421 Mass. 736, 739 (1996).

b. *Validity of the original regulations.* We employ a two-part
inquiry to analyze the validity of duly promulgated regulations.
*Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 632-633
(2005). Using conventional tools of statutory interpretation, we
first consider "whether the Legislature has spoken with certainty
on the topic in question, and if we conclude that the statute is
unambiguous, we give effect to the Legislature's intent." *Id.* If
the Legislature has not directly addressed the issue, we consider
whether the relevant statutory language is sufficiently ambiguous
to support multiple, rational interpretations.[22] *Id.* at 633. See 1
R.J. Pierce, Jr., Administrative Law § 3.6, at 169-171 (4th ed.

agreed that Biogen could cite them as evidence of regulatory history of the
2004 regulations. However, that stipulation does not appear in the record on
appeal.

[21]We reject the Treasurer's argument that Biogen waived any argument
concerning the e-mails by failing to raise any issue as to the e-mails at the
administrative level because Biogen did not receive the e-mails until after the
Treasurer had issued his final decision.

[22]Courts frequently resort to dictionaries and judicial interpretations of
statutory language to determine whether a word or phrase is susceptible of
multiple meanings. 1 R.J. Pierce, Jr., Administrative Law § 3.6, at 170-171
(4th ed. 2002). The plain meaning of a statute, however, is not the only tool of
statutory construction that may aid courts in determining whether an ambigu-
ity exists for purposes of analyzing an administrative regulation. Excessive
reliance on the plain meaning rule in this context may improperly invade the
policy-making province of an administrative agency. Surrounding statutory
language, the statute's purpose, and its legislative history, if any, also may as-
sist courts in determining whether the relevant statutory language may plausibly
be interpreted in more than one way.

2002 & Supp. 2009) (discussing analysis under *Chevron U.S.A. Inc.* v. *National Resources Defense Council*, 467 U.S. 837 [1984]).

Then, if the Legislature has not directly addressed the issue and the statute is capable of more than one rational interpretation, we proceed to determine whether the agency's interpretation may "be reconciled with the governing legislation." *Goldberg* v. *Board of Health of Granby*, *supra*, quoting *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 211 (1995). The ultimate question is whether the policy embodied by the agency's interpretation is reasonable. 1 R.J. Pierce, Jr., *supra* at 172-173. In assessing the reasonableness of an agency's policy, "it is unimportant whether we would have come to the same interpretation of the statute as the agency." *Goldberg* v. *Board of Health of Granby*, *supra* at 633. Our focus is on whether the agency's regulation is the product of reasoned rule making. See 1 R.J. Pierce, Jr., *supra.* We accord substantial deference to the agency's regulations and "apply all rational presumptions in favor of the validity of the administrative action and [do] not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). This deference is heightened where an agency's interpretation is contemporaneous with the enactment of the statute construed, see *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 572-573 (2001), because "the interpretation was made close to the time the Legislature enacted the statute and may represent 'understanding of the public regarding the enactment.' " *Connery* v. *Commissioner of Correction*, 414 Mass. 1009, 1010 (1993), quoting *Wilcox* v. *Riverside Park Enters., Inc.*, 399 Mass. 533, 539 n.14 (1987). Thus, a party challenging the validity of an agency's regulations has a formidable burden. *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 762 (2004).

The Treasurer contends that "outstanding credit balance" refers to "[t]he status of an account when the sum of credit entries exceeds the sum of the debit entries," Black's Law Dictionary 396 (8th ed. 2004), and that the original regulations were inconsistent with the statute because they deemed "any other value potentially due and owing to a vendor or commercial customer"

to be a credit balance without reference to the status of the obligation in a holder's accounting records.

The statute does not define the phrase "outstanding credit balance," and neither party has identified any conclusive legislative history concerning its meaning. We therefore consider whether the statute is capable of more than one rational interpretation. See *Goldberg* v. *Board of Health of Granby, supra* at 632-633. While the Treasurer's interpretation is certainly plausible, nothing in G. L. c. 200A, § 5, compels it. Cf. *First Fed. Sav. & Loan Ass'n v. State Tax Comm'n*, 372 Mass. 478, 483 (1977) (discerning "no basis . . . for assuming that the Legislature intended to import accounting practice into its statutory language and thus to permit accounting principles to be the guide to the meaning of the words [in question]"). We think that interpreting the outstanding credit balance exemption to apply to uncashed accounts payable checks is also rational. An expansive construction of the outstanding credit balance exemption finds support in the statute's requirement that the credit balance be "outstanding," or "uncollected, unpaid . . . continuing in being: unresolved." Webster's Third New Int'l Dictionary 1604 (1993).[23] When a check issued to pay a credit balance remains uncashed, the underlying liability remains unpaid or uncollected. A broad interpretation of the phrase "outstanding credit balance" also furthers the ostensible purpose of the outstanding credit balance exemption, i.e., to exempt certain obligations between businesses from the abandoned property laws. We note that nothing in G. L. c. 200A, § 5, or the surrounding sections definitively demonstrates that the Legislature intended to limit the exemption to credit balances presently recorded as such in a holder's accounting records.[24] Because the outstanding credit balance exemption is susceptible of multiple, rational interpretations, we conclude that the words "outstanding credit balances" are ambiguous and thus properly the subject of agency rule making. See G. L. c. 200A, § 13A.

---

[23]The Treasurer contends that a credit balance cannot be outstanding once it has been reduced to a check. His interpretation is contingent on a very technical understanding of the term "credit balance" that is not required by the statute. It is equally plausible to construe the words "outstanding credit balance" as referring to outstanding obligations between businesses that originated as credit balances on a business's books.

[24]We reject the Treasurer's contention that legislative intent to treat credit balances and checks differently pursuant to c. 200A is clearly established by

Turning to whether the original regulations interpreting the words "outstanding credit balances" are reasonable and applying all rational presumptions in favor of validity, see *Consolidated Cigar Corp.* v. *Department of Pub. Health, supra,* we conclude that applying the outstanding credit balance exemption to uncashed accounts payable checks is consistent with c. 200A. The original regulations were enacted contemporaneously with the statute and thus are entitled to heightened deference. See *Connery* v. *Commissioner of Correction, supra.*

A review of the testimony at the hearing concerning the original regulations indicates that Treasurer O'Brien, who appears to have been the impetus behind St. 2000, c. 198, considered the input of a number of business and trade organizations in promulgating the regulations. Treasurer Cahill does not suggest that Treasurer O'Brien failed to engage in thoughtful, reasoned deliberation in promulgating the regulations. See note 4, *supra.* Because we discern nothing in the record suggesting that the original regulations were the product of rash, uninformed rule making, we conclude that the original regulations were reasonable.

c. *Retroactivity of the amended regulations.*[25] The Treasurer argues that even if we find the original regulations valid, the

---

G. L. c. 200A, § 1, which defines "[p]roperty" for purposes of c. 200A. That section provides, in relevant part:

> " 'Property', all intangible property, including: (i) money, money orders, *checks,* drafts, deposits, interest, dividends, income and bonds; (ii) *credit balances,* customer overpayments, security deposits, refunds, credit memos, unpaid wages, unused airline tickets, mineral proceeds and unidentified remittances; (iii) stocks and other intangible ownership interests in business associations; (iv) money deposited to redeem stocks, bonds, coupons and other securities, or to make distributions; (v) amounts due and payable under the terms of an annuity or insurance policy; (vi) amounts distributed from a trust or custodial fund established under a plan to provide any health, pension, vacation, severance, retirement, death, stock purchase, profit sharing, employees savings, supplemental unemployment insurance, or similar benefit; and all tangible property, which includes all other property not defined herein as intangible" (emphasis added).

The fact that the Legislature differentiated between checks and credit balances in what appears to be a nonexhaustive definition of intangible property does not amount to definitive legislative intent to exclude credit balances that have been reduced to a check from the outstanding credit balance exemption.

[25]The Treasurer argues that nothing in St. 2000, c. 198, authorizes the

current regulations apply retroactively because they are curative, and, in any event, do not affect Biogen's substantive rights because Biogen did not have any right to unclaimed funds. For the reasons discussed above, we reject the former contention because the original regulations did not suffer from any defect requiring a curative regulation. The latter argument also fails.

Principles governing statutory construction and application also apply to regulations. See *Hellman* v. *Board of Registration in Med.*, 404 Mass. 800, 803 (1989). Thus, a regulatory change affecting substantive rights generally only applies prospectively. See *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914); *Figueroa* v. *Director of the Dep't of Labor & Workforce Dev.*, 54 Mass. App. Ct. 64, 70-71 (2002). A new policy may not be retroactively applied where a prior agency policy existed, unless the existing policy was plainly contrary to the enabling statute. See *Commissioner of Revenue* v. *BayBank Middlesex*, 421 Mass. 736, 741-742 (1996). However, regulatory changes may operate retroactively "(1) where legislative intent expressly or impliedly indicates retroactive application is desirable; (2) where the statute is ameliorative or curative in nature; or (3) where fulfillment of the parties' reasonable expectations may require the statute's retroactive application." 2 N.J. Singer, Sutherland Statutory Construction § 41:4, at 399 (6th ed. rev. 2001). See *Canton* v. *Bruno*, 361 Mass. 598, 606-607 (1972) (legislative changes to remedy past errors, omissions, and neglects, may be retroactive); *Figueroa* v. *Director of the Dep't of Labor & Workforce Dev.*, supra at 71 & n.11. Cf. *Goldberg* v. *Board of Health of Granby*, supra at 639 (not irrational or arbitrary for Department of Environmental Protection to conclude that regulation increasing setback distance for landfill site not applicable where landfill operator had reasonable expectation that prior regulation would apply).

---

retroactive application of the outstanding credit balance exemption. This argument is made for the first time on appeal; accordingly, it is waived. See *Porter* v. *Treasurer & Collector of Taxes of Worcester*, 385 Mass. 335, 338 n.5 (1982). Even if the issue were not waived, given the creation of an amnesty period and the Legislature's directive that Treasurer O'Brien conduct an outreach and publicity program, we cannot say that Treasurer O'Brien's decision retroactively to apply the outstanding credit balance exemption was impermissible.

Passing the issue whether the amended regulations were properly promulgated, see note 14, *supra*, there is no basis for applying the amended regulations retroactively. The uncashed accounts payable checks may fall within the outstanding credit balance exemption under the original regulations, but indisputably do not qualify for the outstanding credit balance exemption under the amended regulations. As a result, if the original regulations govern, Biogen would not be required to surrender $781,251.34; but, if the amended regulations apply, it would be required to pay the Treasurer that amount. That Biogen merely holds that money for a third party and does not own those funds does not alter the fact that the amended regulations make Biogen liable to the Treasurer for those funds, while the original regulations do not. In essence, because the credit balance exemption under the original regulations applied to uncashed accounts payable checks, the amended regulations effectively impose a new liability on Biogen to surrender those funds to the Treasurer. In these circumstances, the amended regulations cannot be retroactively applied.[26]

3. *Conclusion.* For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered.*

---

[26]The Treasurer's reliance on *Zoning Bd. of Appeals of Canton* v. *Housing Appeals Comm.*, 451 Mass. 158 (2008), and *Taylor* v. *Housing Appeals Comm.*, 451 Mass. 149 (2008), is misplaced as neither case involved the retroactive application of regulations clearly at odds with a predecessor's regulations and internal policy.