NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-165

FRANK N. GOBBI, JR., trustee,[1]

vs.

TOWN OF DEDHAM & another.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Frank N. Gobbi, Jr., as trustee of the Gobbi Revocable Trust, appeals from a Superior Court judgment upholding the decision of the Conservation Commission of Dedham (commission) to deny his after-the-fact application for a stormwater management permit. On appeal, the plaintiff contends that the commission improperly applied revised regulations that were adopted while his application was pending and acted arbitrarily and capriciously in denying his permit application. The plaintiff also appeals from an order denying his postjudgment motion to expand the record to include meeting minutes that purportedly evince the commission's intent to

_____

[1] Of the Frank N. Gobbi Revocable Trust.

[2] Conservation Commission of Dedham.

exempt pending applications from the revised regulations.  We affirm.

Background.  1.  Regulatory framework.  In 1996, the town of Dedham (town) adopted a stormwater management bylaw (bylaw) to "protect, maintain and enhance the public health, safety, environment and general welfare of the Town by establishing minimum requirements and procedures to control the adverse effects of soil erosion and sedimentation, construction site runoff, [and] increased post-development stormwater runoff and nonpoint source pollution associated with new development and redevelopment."  To advance that objective, the bylaw requires residents to obtain a stormwater management permit (permit) from the commission before commencing any project that alters or disturbs land area in excess of 500 square feet.  The permitting process allows the commission to monitor and manage the impact of such projects on the community.

Pursuant to its authority under the bylaw, the commission adopted stormwater rules and regulations governing project requirements and the permitting process.  Two different versions of the regulations are relevant here:  the version adopted in 2008 (2008 regulations) and the version adopted on November 15, 2018 (2018 regulations).  Both versions require redevelopment projects to improve existing conditions at the project site and comply with stormwater management standards issued by the

Massachusetts Department of Environmental Protection (DEP standards). DEP standard 3 requires projects to include infiltration measures that minimize or eliminate the loss of annual recharge to groundwater. DEP standard 4 states that projects must include stormwater management systems designed to remove eighty percent "of the average annual post-construction load of Total Suspended Solids (TSS)." DEP standard 7 states that redevelopment projects need only comply with DEP standards 3 and 4 to "the maximum extent practicable."

The 2018 regulations introduced several new requirements that did not appear in the 2008 regulations. Specifically, § 5.A.3 of the 2018 regulations requires projects be designed to "[r]etain the volume of runoff equivalent to, or greater than, two (2) inches multiplied by the total post-construction impervious surface area on the site" (hereinafter, "the two-inch storage requirement"). Section 5.A.3 additionally requires all development projects to include a stormwater management system that removes eighty percent of TSS, thus negating the exemption in DEP standard 4 allowing redevelopment projects to remove eighty percent of TSS to "the maximum extent practicable."

Under the 2018 regulations, after a permit application is submitted, the commission "may request the submission of additional information," including, but not limited to, information "to describe the site, the work, or the effect of

3

the work on water quality and runoff volume." The commission is authorized to approve a permit application "upon finding that the proposed project will protect water resources and meets the objectives and requirements" of the bylaw, or to deny the application "due to non-compliance with Design Standards."

2. The project. The plaintiff owns a commercial property in the town that consists of a retail building, parking lot, and plantings. In June of 2018, the town's building commissioner learned that the plaintiff planned to regrade and repave portions of the property's parking lot (project), purportedly to meet certain requirements of the Americans with Disabilities Act.[3] On June 12, 2018, the town's conservation agent, Elissa Brown, sent the commissioner an e-mail message stating that she had determined, pursuant to the commissioner's request, that the project would require a permit.[4]

On August 2, 2018, the plaintiff's project engineer, John Glossa, of Glossa Engineering, Inc., sent Brown a letter summarizing the plan for the project (project plan) and stating his opinion that the work would not trigger the permit requirements of the bylaw. On August 8, 2018, Brown sent Glossa

_____

[3] The record is unclear as to how the building commissioner learned of the project.

[4] There is no evidence that the plaintiff was informed that Brown had evaluated the site and determined the project would require a permit until August of 2018, as discussed infra.

4

an e-mail message explaining that a permit would, in fact, be required, because the project involved regrading more than 500 square feet of land.  Over the next few days, Glossa and Brown exchanged several additional e-mail messages disputing the necessity of a permit, unwavering in their respective positions.

On August 15, 2018, the plaintiff commenced the project without a permit.  The commission issued a stop work and enforcement order to the plaintiff the following day.  On August 17, 2018, the commission received a letter from the plaintiff's attorney disputing the necessity of a permit and stating that the plaintiff intended to continue the project without one.

3.  The application.  On August 28, 2018, the plaintiff submitted an after-the-fact permit application (application) seeking retroactive approval of the project.[5]  The project plan accompanying the application did not include any proposed stormwater infiltration measures or indicate how it would otherwise improve existing conditions.

The commission held nine public hearings on the application between September 6, 2018, and March 21, 2019.[6]  During the

_____

[5] The application stated that approximately 18,434 square feet of the property had already been repaved and regraded and that another 3,938 square feet of the property would need to be repaved and regraded to complete the project.

[6] The hearings were held on September 6, 2018; September 20, 2018; October 4, 2018; October 18, 2018; November 1, 2018;

5

public hearing process, the plaintiff resisted numerous directives to incorporate stormwater improvements into the project plan and failed to comply with the commission's requests for information it needed to assess whether the project plan was feasible and consistent with the requirements of the regulations and bylaw.[7]

The plaintiff's resistance to the commission's directives is perhaps best demonstrated by the way he and his representatives responded to the commission's requests to add stormwater infiltration measures to the project plan. At the first public hearing, on September 6, 2018, Glossa stated that infiltration measures would be "a potential liability" given the property's proximity to railroad tracks and status as a former coal yard. At the same hearing, Glossa was informed that even if there was coal in the soil (the commission noted the absence of documentation to that effect), it was not considered a hazardous material that would exempt the plaintiff from the infiltration requirements of the regulations. Glossa and the

---

December 6, 2018; December 20, 2018; February 21, 2019; and March 21, 2019.

[7] The evidence in the record strongly suggests that the plaintiff's recalcitrance was rooted in a belief that he was, or should be, exempt from permit requirements. The plaintiff unsuccessfully raised this issue in his Superior Court appeal and, in briefing the instant appeal, did not challenge the Superior Court judge's determination that a permit was required.

6

plaintiff nevertheless continued at subsequent hearings to cite the potential presence of coal in rejecting the commission's directives to incorporate infiltration measures.

At a hearing on December 6, 2018, a representative of the plaintiff told the commission that infiltration "would not be impactful" due to the poor quality of the soil at the property. The commission responded that the regulations did not exempt the property from infiltration requirements based on its soil type, and advised the plaintiff and his representative of various ways the project could be engineered to alleviate concerns about groundwater breakout and contamination. Yet at the next hearing, on December 20, 2018, Glossa stated that due to the presence of residual coal in the property's soil, "he would not design the project to the specifications of the Commission," and that "in his opinion" the commission's recommendation to incorporate infiltration measures in the upper parking area of the property "would not be feasible." In response, a commissioner told Glossa that Glossa had "a responsibility to do his due diligence, and prove [his] claims," by using a licensed site professional to review the soil data and support the claims of potential contamination. He never did.

Glossa submitted a new project plan in early January of 2019, accompanied by a letter stating that the plan did "not show [the] storm water recharge that was recommended by the

Commission" because "[i]t would be extremely expensive . . . to install a viable recharge system," "[g]iven the impermeable soil conditions . . . , it is likely that any recharge system will fail in a short period of time," and, due to the "possibility" that recharging stormwater would "cause severe problems including sink holes and a discharge to the ground of harmful materials." Following a January 17, 2019, meeting between the plaintiff's representatives, the commission, and the town's building and engineering departments, Glossa revised the project plan again on January 23, 2019 (final project plan).

At a hearing on February 21, 2019, Glossa pointed out that the final project plan included a subsurface galley that would accommodate .10 inches of recharge. When a commissioner advised him that the soil type at the property required .30 inches of recharge and noted that the final project plan did not satisfy the two-inch storage requirement that had been introduced in the 2018 regulations, Glossa responded that the plaintiff "was opposed to the 2-inch storage requirement." At the same hearing, Glossa told the commission that the plaintiff was "unwilling" to clean a drainpipe bisecting the property, as the town's engineering department and commission had requested. The plaintiff also refused to comply with the commission's request that he determine the exact location of the drainpipe, claiming that it would be an "undue hardship."

On March 21, 2019, the commission voted to close the public hearing.[8]  The commission issued a decision denying the plaintiff's application the same day.

4.  The commission's decision.  The commission found that the plaintiff had not met his burden to demonstrate "by a preponderance of the credible evidence that the work proposed in the application will not have unacceptable adverse or cumulative effect on the resource areas protected" by the bylaw, and that he had likewise failed to submit "adequate evidence to show the effect the proposed project may have on the surface water or ground waters of the Commonwealth, and/or the storm drainage system of the Town of Dedham."  The commission cited, among other things, the plaintiff's failure to provide evidence of abutter notification or submit a site plan with a precise location of the drainpipe bisecting the property.  See 2018 regulations, § 6.B and appendix B.

The commission also determined that the final project plan did not comply with the DEP standards as required by § 5.A of the 2018 regulations.  Specifically, the commission found that the final plan did not comply with DEP standard 3, because it did not use infiltration to minimize loss of annual recharge to

---

[8] The decision denying the plaintiff's application says the hearing was closed on March 7, 2019, but the minutes indicate the hearing was closed on March 21, 2019.

groundwater "to the maximum extent practicable"; DEP standard 4, because the surface water management system the plaintiff had proposed only removed forty-four percent of TSS, and therefore, did not meet the requirement to remove eighty percent of TSS "to the maximum extent practicable"; DEP standard 7, because the final plan did not meet the other DEP standards to the "maximum extent practicable"; and DEP standard 10, because the plaintiff had failed to file an illicit discharge compliance statement.

Further, the commission concluded that the final plan did not meet the requirements of § 5.A.3 of the 2018 regulations because it did not fulfill the two-inch storage requirement or remove eighty percent of TSS. The commission stated that it had been unable to determine whether the final project plan met the third requirement of § 5.A.3, for stormwater management systems to remove sixty percent of the average annual load of total phosphorus, because the plaintiff had failed to provide any calculations regarding the removal of total phosphorus at the property.

The commission also denied the plaintiff's request for waivers exempting him from requirements to remove eighty percent of TSS and to locate all existing stormwater utilities because the plaintiff "did not provide any supporting information" concerning the hardship he had alleged those requirements imposed.

10

5.  Superior Court appeal.  On May 17, 2019, the plaintiff brought a certiorari action in Superior Court seeking judicial review of the commission's decision and asserting claims to quiet title and for trespass related to the drainpipe under the property.  In turn, the commission asserted counterclaims for injunctive relief, to enforce the bylaw, and for a civil penalty.

On November 6, 2020, a Superior Court judge issued an order denying the plaintiff's motion for judgment on the pleadings and allowing the commission's cross motion with respect to the plaintiff's certiorari claim and the commission's counterclaim for injunctive relief.  In his memorandum of decision, the judge rejected the plaintiff's contention that the commission improperly applied the 2018, rather than the 2008, regulations, and held that the plaintiff's application and requests for waivers had been properly denied.  The parties later agreed to stay the injunctive order pending the outcome of the instant appeal and stipulated to the dismissal of the claims for trespass, quiet title, and a civil penalty.  Judgment entered on July 28, 2021, and the plaintiff timely appealed.

In January of 2022, the plaintiff filed a motion in the Superior Court pursuant to G. L. c. 30A, § 14 (4), and Mass. R. A. P. 8 (e) (1), as appearing in 481 Mass. 1611 (2019), seeking to expand the administrative record to include minutes of the

11

commission's November 15, 2018, meeting.  In support, the plaintiff asserted that the minutes evinced the commission's intent to apply the 2018 regulations prospectively -- that is, only to applications received from November 15, 2018, forward. A second Superior Court judge denied the motion on January 31, 2022.  Again, the plaintiff timely appealed.  The two appeals were consolidated.

Discussion.  1.  Motion to expand the record.  The plaintiff challenges the Superior Court order denying his motion to expand the record and encourages us to consider the November 15, 2018, meeting minutes sua sponte as part of the record in the instant appeal.[9]  See Mass. R. A. P. 8 (e) (1) (appellate court may cure material omissions from record on motion of parties or on its own motion).  Assuming we obliged, at most, the minutes would support the proposition that the 2018 regulations applied to new applications, without regard to pending applications.  Thus, the absence of the minutes from the record would not be a material omission, as the minutes are silent on the applicability of the 2018 regulations to pending applications such as the plaintiff's application.

---

[9] Ordinarily, we would review the order denying the plaintiff's motion to expand the record for an abuse of discretion.  See Commonwealth v. Roxbury Charter High Pub. Sch., 69 Mass. App. Ct. 49, 53 (2007).  The plaintiff's request that we consider the minutes sua sponte appears to be an attempt to circumvent this deferential standard of review.

12

Nevertheless, the plaintiff's contention that the minutes should be included in the record is waived because it is untimely. "It is implicit in [rule 8 (e)] and in the very nature of the appellate process that any correction to the record must take place before the appeal has been decided" (emphasis added). Hamed v. Fadili, 408 Mass. 100, 104 (1990). In this case, the plaintiff did not file his motion to expand the record until January 5, 2022 -- well over one year after his appeal of the commission's decision to the Superior Court was decided (though judgment did not enter until July 28, 2021). During oral argument, the plaintiff's counsel stated that she discovered the November 15, 2018, minutes when she began preparing for the instant appeal and "searched all the different minutes to see if there was anything for when the actual regulations were put into place." The plaintiff has offered no valid reason why he could not have searched for the minutes, and moved to expand the record to include them, earlier. See Commissioner of Revenue v. Comcast Corp., 453 Mass. 293, 312-313 (2009).

Accordingly, the plaintiff's motion to expand the record was properly denied, and our review of the commission's decision must proceed on the same record on which the first Superior

Court judge based his decision.[10]  See Evancho v. Director of Div. of Employment Sec., 375 Mass. 280, 283 (1978) (postjudgment letter advising judge of document omitted from administrative record "was not timely" and document could not be considered as part of record on appeal).  Cf. Commonwealth v. Aboulaz, 44 Mass. App. Ct. 144, 147 (1998) ("a rational system of further appellate review best fulfills its function if both appellate courts deal with the same record").

2.  The commission's decision.  a.  Standard of review. "We review the allowance of a motion for judgment on the pleadings de novo."  Boston v. Conservation Comm'n of Quincy, 490 Mass. 342, 345 (2022), quoting Kraft Power Corp. v. Merrill, 464 Mass. 145, 147 (2013).  "When considering a case under certiorari, the standard of review may vary according to the nature of the action for which review is sought."  Fafard v. Conservation Comm'n of Reading, 41 Mass. App. Ct. 565, 567 (1996).  "In the context of this review of a conservation commission denial of a permit, we ask whether the commission's action was arbitrary or capricious, based upon error of law, or unsupported by substantial evidence."  Conroy v. Conservation

_____

[10] We acknowledge the defendants' contention that the plaintiff's motion was untimely because Superior Court Standing Order 1-96 requires motions for leave to present additional evidence under G. L. c. 30A, § 14 (6), to be brought within twenty days after the administrative record is filed.

14

Comm'n of Lexington, 73 Mass. App. Ct. 552, 558 (2009). The commission's selection between two conflicting evidentiary views will not be disturbed on appeal as long as that selection was reasonable. See Conservation Comm'n of Falmouth v. Pacheco, 49 Mass. App. Ct. 737, 739 n.3 (2000) (Pacheco).

b. Application of the 2018 regulations. We are not persuaded by the plaintiff's contention that the commission improperly applied the 2018 regulations and should have instead applied the 2008 regulations that were in effect when he filed his application.[11] In the absence of a vested right, "[a] change made in the law pending [an] application for a permit . . . rather than the law existing at the time of filing is to govern action on the application." R.V.H., Third, Inc. v. State Lottery Comm'n, 47 Mass. App. Ct. 712, 716 (1999), quoting Selectmen of Topsfield v. State Racing Comm'n, 324 Mass. 309,

_____

[11] The plaintiff also contends that the 2018 regulations are invalid because certain provisions conflict with the bylaw and expand the scope of what the bylaw requires. The only time the plaintiff raised this issue below was in a footnote of the memorandum he submitted to the Superior Court in support of his motion for judgment on the pleadings. Therein, the plaintiff asserted that the "2018 Regulations are partially or entirely invalid for reasons including their inconsistency with the applicable Bylaws." The plaintiff then acknowledged that he had yet to even examine the issue. Although we conclude that the issue is not properly before us, see Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 232 n.15 (2010), and cases cited, it is worth noting that the bylaw expressly states that where there is a conflict between the bylaw and the regulations, "the more stringent provisions shall apply."

15

314 (1949). Cf. Ziffrin, Inc. v. United States, 318 U.S. 73, 78 (1943) ("a change of law pending an administrative hearing must be followed in relation to permits for future acts. Otherwise the administrative body would issue orders contrary to the existing legislation"). As explained below, there is no evidence that the plaintiff had a vested right to have his application considered under the 2008 regulations, and therefore, the 2018 regulations were properly applied.

In Massachusetts, the mere filing of a permit application does not give the applicant any vested rights to the issuance of a permit. See Caputo v. Board of Appeals of Somerville, 330 Mass. 107, 111 (1953) ("The fact that the plaintiff filed his application for a permit before the ordinance was amended gave him no vested rights"); Spector v. Building Inspector of Milton, 250 Mass. 63, 71 (1924) (filing of permit application gave plaintiff no vested rights because "petitioner held his property subject at all times to every valid exercise of the police power"); Albahari v. Zoning Bd. of Appeals of Brewster, 76 Mass. App. Ct. 245, 249 (2010) (applicant "acquired no rights simply by filing the permit application"). Instead, the right to a permit vests "at the time the applicant is unconditionally entitled to its issuance." Albahari, supra at 250.

Before the 2018 regulations were adopted on November 15, 2018, the commission had already held five public hearings on

16

the plaintiff's application.  During each of those hearings, members of the commission cited deficiencies with the project plan that needed to be resolved before the plaintiff's application could be approved.  At the November 1, 2018, hearing, which was the last hearing before the 2018 regulations were enacted, the plaintiff had yet to incorporate required infiltration measures into the project plan and was instructed to continue working with the town's engineering department to address its concerns about the drainpipe bisecting the property and an oil and grit separator the plaintiff had proposed to install to remove TSS.  Because the plaintiff failed to submit an acceptable plan before the 2018 regulations were enacted, he had no vested right to a permit under the 2008 regulations.  See Albahari, 76 Mass. App. Ct. at 250.

Although exceptions to the general rule have been made to prevent "manifest injustice," see Thorpe v. Housing Authority of Durham, 393 U.S. 268, 282 & n.43 (1969), no threat of injustice is present here.  Section 246-4 of the bylaw permits the commission to "adopt, and periodically amend," its rules and regulations.  Given the commission's authority to periodically modify its regulations, it was unreasonable for the plaintiff to assume that his application would be forever immunized from regulatory changes, particularly where he did not submit his final project plan until approximately two months after the 2018

17

regulations were adopted. Additionally, the commission's request that the plaintiff fulfill criteria that were exclusive to the 2018 regulations, such as the two-inch storage requirement, further underscores the fact that the plaintiff should have anticipated his application would be evaluated under the 2018 regulations.

Accordingly, the 2018 regulations were properly applied.[12]

c. Denial of the plaintiff's application. There is no merit to the plaintiff's assertion that his application was improperly denied. We agree with the first Superior Court judge's conclusion that the commission's decision to deny the plaintiff's application was appropriate based on the plaintiff's failure to comply with § 5.A.3 of the 2018 regulations alone. Specifically, the final project plan did not fulfill the two-

---

[12] The cases the plaintiff relies upon in his brief, Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174 (2009), and Fleet Nat'l Bank v. Commissioner of Revenue, 448 Mass. 441 (2007), are readily distinguishable from this case. In Biogen, 454 Mass. at 191, the Supreme Judicial Court held that the Treasurer of the Commonwealth could not retroactively apply amended regulations requiring the plaintiff to factor a new category of funds into its annual payments under abandoned property laws. In Fleet, 448 Mass. at 450, the Supreme Judicial Court held that the Commissioner of Revenue could not retroactively apply a legislative amendment extinguishing the right of taxpayers to receive interest on overpayments from the date of the overpayment. Fleet and Biogen thus stand for the proposition that an amended law cannot be applied to usurp rights that were conclusively determined under the antecedent version of the law. In this case, however, the plaintiff did not vest any rights before the amended regulations were adopted.

18

inch storage requirement or remove eighty percent of TSS, and the plaintiff failed to provide calculations necessary to determine whether the final plan would remove the required sixty percent of total phosphorus.

The plaintiff's contention that the commission's decision was arbitrary and capricious because it lacked "any evidence" to conclude that he failed to satisfy DEP standards 3 and 4 "to the maximum extent practicable" lacks merit. As an initial matter, the absence of evidence that the plaintiff failed to meet DEP standards 3 and 4 did not establish that the plaintiff did, in fact, satisfy those requirements. Because the burden of proof rested with the plaintiff, the commission could reasonably conclude that the requirements had not been met based on the plaintiff's failure to submit sufficient evidence that they had.

With respect to DEP standard 3, which requires the use of infiltration to minimize or eliminate the loss of recharge, the Massachusetts Stormwater Handbook (handbook)[13] states that meeting the standard "to the maximum extent practicable" means that:

> "(1) The applicant has made all reasonable efforts to meet the Standard;

> "(2) The applicant has made a complete evaluation of all possible applicable infiltration measures, including environmentally sensitive site design that minimizes land

[13] The 2018 regulations require projects to comply with the DEP standards "and accompanying Stormwater Management Handbook."

disturbance and impervious surfaces, low impact development techniques, and structural stormwater best management practices; and

"(3) If the post-development recharge does not at least approximate the annual recharge from pre-development conditions, the applicant has demonstrated that s/he is implementing the highest practicable method for infiltrating stormwater."

The plaintiff did not satisfy any of the foregoing standards here. To the contrary, he repeatedly refused to consider, let alone evaluate, the additional infiltration measures that were recommended by the commission. Further, although the plaintiff and his representatives cited fears of soil contamination in rejecting the commission's recommendations, the plaintiff never submitted evidence substantiating the claim that soil contamination was a legitimate concern.

The plaintiff's assertion that Glossa's opinion was sufficient to prove that he had met DEP standards 3 and 4 "to the maximum extent practicable" is unpersuasive. The commission was not required to credit Glossa's opinion, especially considering that Glossa failed to hire a licensed site professional to validate his claims, as the commission had specifically requested. A commissioner also noted at one point that Glossa had provided inconsistent reasons in support of his opinion, further casting doubt on its validity. This, coupled with the failure to hire a licensed site professional, provided ample reason to doubt Glossa's expertise and reliability. See

20

Pollard v. Conservation Comm'n of Norfolk, 73 Mass. App. Ct. 340, 349 n.10 (2008) ("An agency may justifiably reject an expert's opinion on the basis of facts in the record that make the rejection of the expert evidence reasonable, including facts of a nontechnical nature . . . [and] where there are flaws in the methodology or assumptions upon which the opinion depends or where the opinion is based upon conjecture of guesswork").

The plaintiff also contends that denying his application prevented him from "significantly enhanc[ing] stormwater treatment at the Property," and thus contravened the purpose of the bylaw. However, the purpose of the bylaw is not only to control the effects of stormwater runoff and pollution, but to "establish[] minimum requirements and procedures" applicable to measures taken in furtherance of that objective. Because the plaintiff failed to satisfy those minimum requirements, the denial of his application did not contravene the purpose of the bylaw.

On the record presented, the plaintiff has not sustained his burden to establish the invalidity of the commission's decision.[14] See Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 792 (2012).

---

[14] To the extent that the plaintiff's appeal raises other arguments not discussed here, such as his challenges to the commission's findings that he failed to notify abutters and provide an illicit discharge statement, we have not overlooked

21

d. _Denial of waiver requests_. We discern no error in the commission's denial of the plaintiff's waiver requests. The plaintiff did not submit any documentation to substantiate his claims that compliance with TSS removal requirements and locating all existing stormwater utilities would impose an undue hardship. See _GreenRoots, Inc_. v. _Energy Facilities Siting Bd_., 490 Mass. 747, 756 (2022), quoting _Mederi, Inc_. v. _Salem_, 488 Mass. 60, 67 (2021) ("A decision is not arbitrary and capricious unless there is no ground which reasonable persons might deem proper to support it"). Moreover, even if the plaintiff had substantiated his claims of hardship, the commission would still have had the discretion to decline his request. See 2018 regulations § 1.E (stating that the commission "may" waive strict compliance with certain requirements).

e. _Injunctive relief_. Last, the plaintiff contends that the Superior Court did not have jurisdiction to grant injunctive relief on the commission's counterclaim. The counterclaim was brought pursuant to § 246-8(A) of the bylaw, which empowers the commission to seek injunctive relief "in a court of competent jurisdiction" against any person who violates the provisions of the bylaw, "or any associated regulations, permit, notice, or order issued thereunder . . . restraining the person from

those arguments, but conclude that they do not merit discussion. See _Commonwealth_ v. _Domanski_, 332 Mass. 66, 78 (1954).

22

activities which would create further violations or compelling the person to perform abatement or remediation of the violation."  Therefore, after the first Superior Court judge determined that the plaintiff was not entitled to a permit under the 2018 regulations and bylaw, he could properly order injunctive relief for the commission on its counterclaim for enforcement.  See Pacheco, 49 Mass. App. Ct. at 744-745.

                                        Judgment affirmed.

                                        Order denying motion to
                                           expand the record affirmed.

                                        By the Court (Neyman,
                                           Desmond & Grant, JJ.[15]),

                                        Joseph F. Stanton

                                        Clerk


Entered:  March 2, 2023.

---

[15] The panelists are listed in order of seniority.

23